[Civ. No. 2867. Second Appellate District, Division Two.—February 26, 1919.]

CONSOLIDATED LUMBER COMPANY (a Corporation), Respondent, v. BOSWORTH, INC. (a Corporation), Appellant; P. C. DOWELL, Defendant.

[1] MECHANIC'S LIEN—TIME FOR FILING CLAIM—WHEN BEGINS TO RUN—NOTICE OF COMPLETION.—The time for filing a claim of mechanic's lien begins to run not from the date of completion, but from the date of the owner's filing of notice of completion of the contract, and it is in time if filed within thirty days thereafter.

[2] ID.—FINDING SUFFICIENTLY DEFINITE—"ON OR ABOUT."—A finding that notice was filed "on or about" a stated time, if indefinite, is not reversible error under section 4½ of article VI of the constitution where there was, in fact, a leeway of several days in which notice might have been filed, and the evidence showed that notice was filed in time.

[3] ID.—FINDINGS — CONTRACT FOR LUMBER — PRICE IN ACCORDANCE WITH CLAIM OF LIEN.—Evidence examined and found to sustain the finding of the court that the contract for lumber was for the reasonable market value and not a fixed price.

[4] ID.—CONCRETE "FORMS"—MATERIAL USED FOR—RIGHT TO LIEN.— Where the nature of concrete work contracted for is such as to require the use of forms to hold it in place while it hardens into a self-sustaining permanent structure, and the materials from which the forms are made are consumed in the process, such materials come within the definition of "materials to be used or consumed" in the construction of a building as contained in section 1183 of the Code of Civil Procedure.

[5] ID.—MEASURE OF LIABILITY FOR MATERIALS USED IN FORMS—DEPRECIATION IN VALUE OF LUMBER CONSUMED.—The percentage of the depreciation in value of lumber consumed by using it for the making of concrete forms, if justified by evidence, is a proper mode of determining the amount for which a lien may be had for materials so used.

[6] ID.—FORECLOSURE—PROOF—CIRCUMSTANTIAL EVIDENCE.—In an action for the foreclosure of a lien for materials used in the construction of buildings, if there is sufficient evidence as to the circumstances and negotiations of the contract and delivery of the material to give rise to a legal inference that the parties arrived at an understanding that the material was sold to be used in the erection and construction of the buildings in question, then under sections 1832, 1859, and 1960 of the Code of Civil Procedure, the court can so find, and base its finding thereon without a word of direct testimony as to such agreement or understanding.

[7] ID.—SEVERAL CONTRACTS FOR BUILDINGS ON SAME PROPERTY—VARIANCE.—Where in a foreclosure under the mechanic's lien law of 1911 the liability of the owner is not limited owing to the failure to file a bond, and the evidence shows three contracts for buildings or parts of buildings on the same property as part of a single enterprise, it can make no difference to the owner whether the liens chargeable against the property arise under one or other of the contracts, and an allegation in the complaint of one contract is not at fatal variance with the proof.

[8] ID.—CARTAGE.—Claims for cartage of materials are properly included in a lien claim as part of the price of materials furnished.

[9] APPEAL—FAILURE TO FIND ON ESSENTIAL ISSUE—CONCRETE FORMS—NECESSITY FOR RETRIAL.—In this suit for the foreclosure of a mechanic's lien, where the court found that all but ten per cent of the value of the lumber used in concrete forms was consumed in such use, but did not determine the amount or value of the material so used, and neither the value nor the quantity is shown in evidence, the cause must be remanded for trial on that issue.

APPEAL from a judgment of the Superior Court of Los Angeles County. Leslie R. Hewitt, Judge. Reversed.

The facts are stated in the opinion of the court.

H. C. Beach, W. N. Goodwin and Hunsaker & Britt for Appellant.

Frank D. McClure for Respondent.

40 Cal. App.—6

SLOANE, J.—This is an appeal of the defendant Bosworth, Inc., from a judgment foreclosing upon said defendant's real property a mechanic's lien for materials alleged to have been furnished to and used by the contractor in the construction of buildings on said premises. Appellant asks that the judgment be reversed on the following grounds:

1. That the claim of lien was not filed in time.

2. That there is a fatal variance between the lien claim and the proof as to the terms of the contract of sale.

3. That the lumber used for forms for pouring cement for the buildings is not the basis of a valid lien.

4. That the proof fails to show that the materials furnished were expressly contracted for the buildings in question.

5. That the finding as to the date of filing claim of lien is indefinite and insufficient.

6. That the complaint alleges, and the court finds, that the buildings in question were erected by virtue of *an* agreement, whereas the proof shows that the buildings were erected under *three separate* agreements.

7. That items of charges sought to be recovered are not covered by the claim of lien.

1. We will consider the first and fifth alleged grounds of error together, as both are directed to the time of filing claim of lien. The court finds that notice of completion of these buildings was filed *"on or about"* the twenty-seventh day of August, 1914, and that thereafter, and *"on or about"* the twenty-first day of September, 1914, the claim of lien was filed. It is alleged in the complaint, and not denied in the answer, that the claim of lien was recorded, *"on"* September 21, 1914. The proof showed that the notice of completion was filed *"on"* the twenty-seventh day of August, and the claim of lien *"on"* the twenty-first day of September. It also appeared in evidence that the buildings were actually completed and accepted on the twenty-first day of August. [1] Appellant argues that the time for filing claim of lien began to run from the date of completion, and that more than thirty days elapsed before the filing of the lien claim, if it was filed September 21st; and that, in any event, the finding is too indefinite in fixing the time "on or about" the dates mentioned. Whatever merit this contention might have if under the facts the last day for filing the claim had been on the 20th or 21st

of September, it is without force under the recent decisions that a lien claimant for materials furnished a contractor may make his filing within thirty days after the date of filing notice by the owner of completion of the contract. (*Hughes Mfg. & L. Co.* v. *Hathaway*, 174 Cal. 44, [161 Pac. 1159]; *Pioneer Paper Co.* v. *Hathaway*, 39 Cal. App. 405, [179 Pac. 227].)

[2] In this case the claimant had several days remaining after September 21st, in which he might file his claim of lien, and with this margin of time a finding that the notice of completion was filed "on or about" the 27th of August, and the notice of lien "on or about" the 21st of September, is probably sufficiently definite as a finding that the lien claim was made within a period of thirty days; particularly as there is no question under the evidence as to that fact. If we were to concede that, as to this question, appellant's position were well taken, nevertheless, since we could not say upon this record that it was made to appear that justice had miscarried, it would be a proper case for the application of section 4½ of article VI of the constitution.

2. There is more room for dispute on appellant's second proposition. The complaint alleges, and it is set forth in the claim of lien, as follows: "That all of said materials were sold and delivered from time to time upon open account, commencing on the twenty-eighth day of April, 1914, and ending on the twenty-ninth day of July, 1914; that there was no express agreement as to the price to be paid for said materials, nor was there any time expressly agreed upon for the payment thereof; but that said materials, at the time of the sale and delivery thereof, were of the reasonable market value of fourteen hundred fifty-eight dollars ($1458), upon which said sum has been paid two hundred fifty dollars ($250), and no more."

[3] It is appellant's contention that the proof shows a specific agreement between Dowell, the contractor, and respondent as to the price for which this lumber was sold and delivered—namely, a fixed and agreed rate per thousand feet. If the record shows, as contended, that a specific sum of money, distinguishable from and independent of the market price, was agreed upon between the parties as the consideration of this sale, there can be no question, under the repeated rulings of the supreme court, that such fact would establish a fatal variance between the lien claim and the proof. (*Reed* v. *Norton*, 90 Cal. 590, [26 Pac. 767, 27 Pac. 426]; *Wagner* v. *Hansen*,

103 Cal. 104, [37 Pac. 195]; *Wilson* v. *Nugent,* 125 Cal. 280, [57 Pac. 1008]; *Robinett* v. *Brown,* 167 Cal. 735, [141 Pac. 368]; *Buell & Co.* v. *Brown,* 131 Cal. 158, [63 Pac. 167].)

In the case last cited the contract was the same as here claimed by appellant. The court there says: ''The court found that the claim of lien set forth a contract to deliver the material at the reasonable market rate, but that the contract was an express one, to wit, $26.50 per thousand for lumber, and $2.50 per thousand for shingles. This was a fatal variance, and prevents a recovery by plaintiff.'' The substance of the evidence given on this point in the case at bar is as follows: ''They were to furnish lumber for certain prices per thousand, and they furnished that lumber. I would say that the price that was paid for the lumber was the market price at that time. There was an agreement to a certain amount. It was practically the market price at that time. It was a certain amount per thousand; it was not a lump sum. There was an amount fixed and agreed upon for each class of lumber per thousand feet, on the first order. We had our understanding as to the price per thousand feet when we first went there. Q. And they agreed that they would furnish you certain lumber at so much a thousand feet? A. For that list of lumber that I submitted to them for prices. After that I simply sent in orders for additional lumber, and they furnished it. Q. And at the same prices which you had previously agreed upon? A. I couldn't say they charged the same prices in each case. I think they did. I do not remember that they deviated from the prices they had agreed upon. My understanding at the start was that the plaintiff would sell the lumber at so much per thousand feet for certain classes of lumber; and afterwards I sent in orders for more lumber, and it was furnished, and they charged on their bills the same prices originally agreed upon. The prices would run from $14 to $20, or some intermediate sum fixed on the first order which I submitted to them for a price. Q. I understand you to say that there was an agreement as to the price of the lumber. Did you have a contract? A. I had no contract; the agreement was the market price. It was listed off to me at the market price. I went to the representative of the Lumber Company, and I asked him for the prices on this material. He said it would be the market prices, and he gave me a list of the market prices.''

The evidence further shows that on the occasion of entering into the agreement for this lumber only a small quantity of the lumber ultimately required was ordered. The deliveries covered a period of three or four months, and are evidenced by orders consisting of thirty-seven separate sheets. The aggregate amount of lumber purchased under these orders was 78,898 feet, and the price as charged to the contractor was a total of $1,458. The evidence, we think, fairly shows that the prices charged by the Lumber Company were the fair market price, as well as the amount that would be arrived at from the prices per thousand feet as shown by the price list referred to by the parties when the first order was made. The construction of the agreement then entered into depends upon whether the price list referred to was used and accepted by the parties as determining the price of all the lumber to be ordered on this contract, or merely as fixing the market price on the order for that date, to be subject to any fluctuation in the market that might occur during the period covered by the subsequent orders.

There can be no question under the evidence that the contractor was offered what lumber he wanted at the market price, and was then shown a list purporting to contain the market price at that date. Had he ordered all his lumber at that time, it could conclusively be said that the list bound the parties to a fixed and definite price per thousand for the various sorts of lumber. But the contractor did not order his full bill of lumber; he only ordered a thousand or two feet. Nothing appears in the record to show that he was in any way obligated to buy another foot of material from this company. Was the company, then, under any agreement to continue this list price in the event there should be an advance in the market price of lumber, or could it say: "We will still furnish you lumber at the market price, but here is a new list showing the advanced price in the market?" If it had such right, then the rates per thousand were not fixed, and the mere fact that there was no change in the market during the period covered by the purchases would not alter the relations of the parties, or make the contract one for a fixed and unalterable price. Under an interpretation of the evidence as last indicated the facts would distinguish this case from the supreme court citations above given.

There has been a growing tendency in the decisions to as much liberality in the construction of the more technical requirements of the mechanic's lien law as is consistent with just regard for the rights of property owners. (*Corbett* v. *Chambers*, 109 Cal. 178, [41 Pac. 873]; *McGinty* v. *Morgan*, 122 Cal. 103, [54 Pac. 392].) And it has been repeatedly held that where the price named and the reasonable market price are the same, a variance between the lien claim and the proof in this particular is not fatal. (*Acme Lumber Co.* v. *Wessling*, 19 Cal. App. 406, [126 Pac. 167]; *Lucas* v. *Gobbi*, 10 Cal. App. 648, [103 Pac. 167]; *Star Mill & Lumber Co.* v. *Porter*, 4 Cal. App. 470, [88 Pac. 497]; *Blanck* v. *Commonwealth Amusement Corp.*, 19 Cal. App. 720, [127 Pac. 805].) The following language from the opinion in *California-Portland Cement Co.* v. *Wentworth Hotel Co.*, 16 Cal. App. 692, 709, [118 Pac. 103, 110], is very applicable to the suggested construction of the evidence as to the terms in this case: "The appellant contends that the evidence does not sustain the findings of the court. Considered as a whole, the evidence received in support of this claim in our opinion does sustain the finding of the court. One of the witnesses testified that the price of $9 per ton was quoted at the time some of the plastering material was ordered, and that this price was accepted; but it also reasonably appears from the evidence that it was contemplated by the parties that this material should be ordered from time to time as needed, and that the price to be paid therefor was not necessarily a uniform price of $9 per ton, but such price as might be indicated by the state of the market at the particular time the merchandise was ordered."

Here, as in the case cited, the trial court found in accordance with the declarations of the claim of lien, and we think the finding was warranted by the evidence.

[4] 3. The next point presented is as to the application of the lien law to lumber furnished to the contractor by respondent and used in making forms for concrete work in the buildings.

This matter was argued on the apparent assumption that no case in point has been decided in the appellate courts of California. This was true at the time of filing the briefs, but the question has since been definitely passed upon in a well-considered opinion by Mr. Presiding Justice Chipman of the third appellate district, in the case of *Olson-Mahoney L. Co.* v.

*Dunne Inv. Co.,* 30 Cal. App. 332, 344, [159 Pac. 178]. A
rehearing was asked in the supreme court and denied on June
30, 1916. This decision, therefore, so far as applicable under
the facts, will be taken as controlling the issue here. It was
there held that in a concrete building, the construction of
which required the use of lumber forms for sustaining the con-
crete in place until it hardened, and where the contract showed
the indispensability and intimate connection of the forms with
the erection of the building, and the lumber so used was of no
value thereafter and was not used for another job, but some
of it given away and some advertised for sale as firewood—
the material so furnished and used was, within the contempla-
tion of section 1183 of the Code of Civil Procedure, used in
the construction of the building, and subject to claim of lien.
In the present case it appears that the contracts called for con-
crete structural work in the buildings to be erected; and,
although the specifications are not given, and it is not shown
what was required in the way of forms for the cement, in any
event, the evidence discloses that the forms were required; and
the use of concrete for building purposes and the methods em-
ployed in such use are now so generally and systematically fol-
lowed as to be a matter of common knowledge. It is apparent
that under the prevailing methods of constructing reinforced
concrete buildings, material for the forms is almost as much
a necessity as the cement itself. Under these conditions we
are in entire accord with the conclusion reached by Justice
Chipman in the opinion cited. It is true that this opinion
expressly disclaims the statement of any rule of general appli-
cation, but the general rule that may logically be deduced
from the conclusions reached is, that where the nature of the
concrete work contracted for is such as to require the use of
forms to hold it in place while it hardens into a self-sustaining
and permanent structure, and the materials from which the
forms are made are consumed in the process, such material
comes within the definition of "materials to be used or con-
sumed" in the construction of a building, as contained in sec-
tion 1183 of the Code of Civil Procedure.

The language of this section of our code provision, so far as
pertinent to the point at issue here, is: "Materialmen . . .
furnishing materials to be used or consumed in . . . the con-
struction . . . of any building . . . shall have a lien upon the
property upon which they have . . . furnished materials . . .

for the value of such . . . material furnished." The words "or consumed" were inserted by the amendment of 1911, and what, if any, added significance they have given to the mechanic's lien law, so far as we are aware, has not been judicially determined. It is argued by appellant in this case that the word "consumed" is merely used as a synonym of the word "used," which precedes it. It hardly seems reasonable or in accordance with the rule which would give meaning to every part of a statute, to hold that the legislature had gone to the trouble of making this addition to the language of the code merely to repeat in another form the meaning already expressed in the word "used"; and, in the light of the limitation which had previously been suggested by the courts upon the expression "used in," as applying only to material which had actually entered into and become a part of the finished structure, it may be reasonably concluded that it was the legislative purpose to apply the term "consumed" to such a use of material in the construction of a building as would result in its destruction. We had, previous to this amendment, the ruling, inconsistent with the prevailing doctrine, that powder furnished for blasting a foundation for a structure was subject to the materialman's lien for material "used in" the structure. (*Giant Powder Co.* v. *San Diego Flume Co.*, 78 Cal. 193, [20 Pac. 419].) By no stretch of the meaning of words could it be said that the powder was used "in the structure"; that is to say, in the language of the court in *Stimson Co.* v. *Los Angeles Traction Co.*, 141 Cal. 30, [74 Pac. 357], "as the materials of which it is constructed." But it may be said that the powder so used is consumed, in a very real and intimate sense, in the construction of the building. This application of the term may be made most appropriately to the material used in the forms for concrete. They do not become a part of the finished structure, but they are consumed as a part of the actual construction, or, even it may be said, as part of the structure. When the concrete walls are first poured they have of themselves no more stability than walls of sand. The forms hold them in shape until the concrete hardens, and perform a part, temporarily at least, essential not only to the erection but to the support of the building; and if their substance or their value is consumed in this purpose, may it not be said that these materials have been consumed in and as part of the building?

As has been pointed out, none of the decisions relied upon to exclude the lienability of materials thus used has dealt with the quality of use covered by the words "consumed in," of the amended statute; and it may even be questioned if there is justification in any of the decisions for the limitation of the words, "used in" to materials that have actually entered into and become a physical part of the structure. The code does not say that the materials must have been used in the building, or in the structure of the building, but that they must have been used in the *construction* of the building—in the actual process of erecting the building; and, so far as the decisions have been called to our attention, while they have used the broad language that the use must be such as to enter into and become a part of the finished building, they have, in restricting the application of the lien law, practically dealt with materials which were only used as an aid to, or preparation for, the work of actual construction, and not as a part of the actual construction of the building itself.

In the case of *Stimson Mill Co.* v. *Los Angeles Traction Co., supra*—so much relied on by appellant here, and in which the rule contended for by appellant is most strongly stated—the material in question was lumber used by the contractor for a railway bridge, in building a temporary timber trestle to support the stringers, ties, and rails of the railway, because of delay in the delivery of the steel and other material of which the finished supports were to be made. This work was obviously no part of the construction contemplated by the contract, but a temporary makeshift to avoid delay in other parts of the work. The commissioner's opinion in that case, holding these materials not covered by the lien law of our codes, after stating the rule that the materials to be within the code provision must be furnished "to be used, and must actually be used," in the construction of the building, makes use of the following language: "And this, we understand, means that the materials must be used, not merely in the process of construction, but in the structure—that is to say, they must be used as the materials of which it is constructed." (Citing *Hamilton* v. *Delhi Min. Co.*, 118 Cal. 153, [50 Pac. 378]; *Silvester* v. *Coe Quartz Mine Co.*, 80 Cal. 513, [22 Pac. 217]; *Gordon Hardware Co.* v. *San Francisco etc. R. R. Co.*, 86 Cal. 620, [25 Pac. 125].) We have examined the foregoing citations and fail to find a suggestion in either the facts of the

cases stated or in the language of the decisions to give support to any rule or construction which would exclude from the application of the lien law materials furnished and used in a way to exhaust their substance or value, in the actual process of construction, whether or not they become a part of the finished structure.

Appellant relies upon, and quotes at length from, *California-Portland Cement Co.* v. *Wentworth Hotel Co., supra,* and especially emphasizes the following quotation from the opinion: "The counter-line of decisions holding that such liens are given only where the materials have actually entered into and become a part of the structure are reasoned out on a line of argument having as a basis the theory that liens of the variety mentioned are provided to be given upon the assumption that the property to which they are made to attach has been improved and its value enhanced by the labor bestowed or materials furnished; hence, that where such labor or materials do not actually enter into the structure, no lien results. To the latter effect are all of the California cases." (Citing *Stimson Mill Co.* v. *Los Angeles Traction Co., supra,* and all the cases on this point therein referred to, together with a number of additional California decisions.) The matter before the court in the Wentworth Hotel case was a claim of lien for materials furnished for, but, owing to a change in the plans of the building, never used in the building or in connection with it; and the appellate court in its decision had no reference to materials actually used and consumed in the process of construction of a building, though not entering into the finished structure. The argument of the court and the authorities cited fit the facts and the issues before it, but neither the one nor the other has the remotest application to a state of facts where the materialman has contracted and furnished materials whose substance and value have gone into the actual process of building, and have materially enhanced the value of the completed structure, though not remaining as part of it. This distinction is recognized in the case of *Pacific Sash & Door Co.* v. *Bumiller,* 162 Cal. 664, [41 L. R. A. (N. S.) 296, 124 Pac. 230], holding that lard oil applied to threads of joints, and soapstone on the inside of pipes, were covered by the materialman's lien. In this opinion this significant language is used: "Soapstone was used on the inside of pipes as lubricant to facilitate the pulling of wires through the pipe. This being a

part of the work of construction, we think it may also be considered as part of the material used in construction for which a lien may be claimed.''

There are many decisions from other states on this precise question of application of the lien laws to materials for forms in the erection of concrete buildings, and they are somewhat in conflict. Many of these have been considered in the opinion of the court of appeal in *Olson-Mahoney Co.* v. *Dunne Inv. Co., supra,* and no useful purpose would be served by attempting to review them here. It is our opinion, however, that the weight of authority and better reasoning sustains the doctrine of lienability of such materials where used and consumed in the actual work of construction. The conclusion goes only to materials used and consumed in the forms as part of the process of actual construction. There obviously can be no claim of lien for material retaining its identity as lumber, which, after its use in the forms in the building for which it was furnished, is taken down by the contractor and removed for use elsewhere. Material so removed, to the extent, at least, that it retains its value and identity, cannot be said to have been used or consumed in the construction, in the sense contemplated by the code.

[5] But what logical reason can be assigned for denying the claim of lien to that proportion of the material so furnished, which, either as to its substance or its value, has actually entered into and been consumed in the work of construction? There can be no injustice to the owner of property which is properly chargeable with the full value of lumber totally consumed in such a use, in making his property liable for half the material, if one-half is consumed, or one-half the value, if its value is depreciated one-half by the use. Neither does there appear to be any practical difficulty in arriving at a just estimate of values on this basis. In this case some of the lumber for forms was used over and over again in different stages of the construction, so as to practically destroy its commercial value for any purpose. Some of it was sawed up into short and irregular lengths, so as to destroy its further use and identity as lumber. Some of it was but slightly depreciated in value, or changed in form, and when removed had a commercial value of perhaps one-half its original price. The court found, on all the evidence, that, in the aggregate, ninety per cent in value of all the lumber used in forms was con-

sumed in that use. If this finding was justified by the evidence, it accurately fixes the measure of value of the material which, through the use of these forms, went into defendant's building.

This method of fixing the liability for the use of material in concrete forms has been adopted by the courts of a number of other states, and we see no reason why it is not logical and fair. In *Darlington L. Co.* v. *Westlake Co.*, 161 Mo. App. 723, [141 S. W. 931], the court says: "Where certain material is provided for in the contract in the erection of a structure, and is furnished and used accordingly, and is either in whole or in part consumed in its use, the materialman is entitled to a lien for the material thus consumed in the erection of the structure to the extent of the consumption of its reasonable value, regardless of the fact whether or not such material formed a permanent part of the structure when completed. Consumption of value means a depreciation in the market value of the material by the use provided for by the contract." Relating to a claim of lien for material used in forms for a concrete building, where the value of a portion of the material was only partly destroyed, the supreme court of Wisconsin, in *Moritz* v. *Lewis Const. Co.*, 158 Wis. 49, [51 L. R. A. (N. S.) 1040, 146 N. W. 1120], says: "Nor do we see any valid reason for denying a lien for the amount of depreciation of the remaining twenty-five per cent of the lumber used for shoring. This lumber was likewise used in the construction of the building, but in such use was not wholly consumed, but was consumed or destroyed to the extent found by the court below, and for which amount of destruction or consumption a lien was awarded." (To the same effect, *Barker & Stewart Lumber Co.* v. *Marathon Paper Mills Co.*, 146 Wis. 12, [36 L. R. A. (N. S.) 875, 130 N. W. 866]; *Chicago Lumber Co.* v. *Douglas*, 89 Kan. 308, [44 L. R. A. (N. S.) 843, 131 Pac. 563].)

[6] 4. The next point urged is that there is no evidence in this case to support the allegation of the complaint and finding of the court "that all of the material was sold to be used in the erection and construction of said buildings." It must be confessed that there is little or no direct evidence in the record of an express agreement to this effect. Appellant says that "proof of such an agreement or understanding between Dowell [the contractor] and respondent is absolutely essential to the maintenance of respondent's judgment," and that

"we cannot infer that there was such an agreement." Proof that there was such an agreement or understanding is essential, but we do not agree with counsel for appellant that such agreement cannot be established by inference. If there is sufficient evidence as to the circumstances and negotiations of the contract and delivery of this material to give rise to a legal inference that the parties arrived at such an understanding, the court can base its finding thereon, without a word of direct testimony as to such agreement or understanding. (Code Civ. Proc., secs. 1832, 1959, 1960; *Savings & Loan Soc.* v. *Burnett,* 106 Cal. 514, [39 Pac. 922].) The force of all indirect evidence rests on inference. There is some evidence in the record here tending to support, by logical inference, the finding of the court that it was definitely understood between the parties that this lumber was furnished to be used on these particular buildings; and in view of the entire absence of any testimony, circumstance, or condition to the contrary, we are not prepared to say the trial court was not justified in its finding. The material as ordered was to be delivered, and was delivered, at the place where these buildings were being constructed, and which was not the place of business of the contractor, Dowell, except for this particular contract. This destination of delivery was entered on the bills of respondent for all the numerous orders of lumber. It appears from the testimony of the contractor that he ordered the material for these buildings. Fred Westfall, the estimator for respondent, was asked by counsel if he estimated the lumber "that was sold to Mr. Dowell for the Bosworth buildings," and if he knew the market value of the lumber that was sold at that time, and he gave the prices as shown by the lists of the entire order. These facts, taken in connection with the generally known and established custom of dealers to charge materials so furnished to the particular job on which they are used, furnishes some evidence, though slight, as to an agreement and understanding of the parties. There can be little excuse for a lien claimant allowing his contract, in this material particular, to rest upon such slight showing; but where the moral probabilities as to the transaction are so strongly with the respondent, we will not disturb the finding in his favor.

[7] 5. Appellant's sixth assignment of error arises upon the variance between the allegations of the complaint and the proof offered as to the contracts under which the buildings

were constructed. The complaint alleges a single contract; the evidence discloses three contracts for different parts of the work. No issue was made as to this point by the answer, but under a stipulation at the trial the matter becomes an issue here. It is contended by appellant that where the liability against defendants' property is shown to have accrued under three separate contracts, each covering a distinct part of the work, the items of the lien claim cannot all be lumped together and made chargeable on the entire job, irrespective of the contract under which they may have arisen. This possibly might be true under the mechanic's lien law prior to 1911, where the contracts had been made according to law and filed with the county recorder, or, under the amended law of 1911, where the liability of the owner had been limited by the execution of a bond as provided by section 1183. This case arises under the amended mechanic's lien law of 1911, and it does not appear that any bond was executed, and there is therefore no limitation on the liability of the owner for lien claims. It can make no difference to him whether the liens chargeable against this property arise under the one or the other of the contracts. It appears from the evidence that the three contracts were for buildings, or parts of buildings, all erected on the same property, and as part of a single plant or enterprise. Under these conditions we see no reason why the construction of the court reached in *Booth* v. *Pendola*, 88 Cal. 36, [23 Pac. 200, 25 Pac. 1101], does not apply here.

A similar and more pointed ruling on the same matter is made in the case of *Acme Lumber Co.* v. *Wessling, supra,* where the lien claims arose under several separate oral contracts, and the court held that "it was not necessary to the validity of the claim of lien that it should be set forth that the demand was based upon more than one contract, and then segregate and separately state the amount of each, even though the evidence adduced in support of the lien shows that the work and labor for which the lien is claimed was performed upon separate and distinct structures, under separate and distinct contracts." (Citing *Kritzer* v. *Tracy Eng. Co.,* 16 Cal. App. 287, [116 Pac. 700] ; Borsot on Mechanics' Liens, sec. 408.)

[8] 7. The items charged up with this material for cartage seem to have been incorporated as part of the price of the total bill rendered for "material furnished," and were prop-

erly so included as part of the claim of lien for value of the materials. (*West Coast Lumber Co.* v. *Newkirk,* 80 Cal. 275, [22 Pac. 231]; *Woods, Curtis & Co.* v. *Eldorado L. Co.,* 153 Cal. 232, [126 Am. St. Rep. 80, 15 Ann. Cas. 382, 16 L. R. A. (N. S.) 585, 94 Pac. 877].)

[9]   We are of the opinion that the plaintiff is entitled to enforce his lien for the material furnished and used in forms to the extent of the value consumed in such use; but are at a loss to understand how the trial court arrived at the valuation fixed by the findings.   The evidence covering this question is confusing to the degree of being unintelligible, but, even then, assuming the correctness of the court's finding that all but ten per cent of the value of the lumber used in forms was consumed in that use, there is nothing in the findings determining the amount or value of the material which was used for forms.   The total amount and value of all lumber furnished is found, but it appears from the evidence that some thousands of feet of flooring went into the buildings which was not used for forms.   The value of this does not appear in evidence, and neither the value nor quantity appears in the findings, which leaves an indeterminate quantity, as well as value, of the lumber that was used and consumed in the forms. Again, after finding that ten per cent of the value of the lumber used for forms was not consumed in such use, the findings fix the value of the salvage at only $75, and the judgment is based on that deduction; whereas, on any basis of fact justified by the evidence, ten per cent of the value of material used in forms must have amounted to nearly twice that sum.

As we see no way of modifying the judgment, under the condition of the record, the case will be remanded for a new trial as to the one issue relative to the value of the material furnished and consumed in the construction of these buildings.

Finlayson, P. J., and Thomas, J., concurred.